IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| JOSE RAMOS-CRUZ, et al.,<br><br>        Plaintiffs<br><br>              v.<br><br>CENTRO MEDICO DEL TURABO, INC.,<br>et al.,<br><br>        Defendants | CIVIL NO. 08-1924 (JP) |

## OPINION AND ORDER

Before the Court is Defendants Centro Medico del Turabo d/b/a Hospital HIMA San Pablo Fajardo (the "Hospital") and HIMA San Pablo Captive Insurance Company Limited's ("HIMA Insurance") motion for summary judgment (No. 34), and Plaintiffs Jose Ramos Cruz and Deborah Lopez-Pagan's opposition thereto (No. 38). Plaintiffs filed the instant lawsuit pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, alleging that the Defendant Hospital improperly transferred their son, Jose Ramos Lopez ("Ramos"), to a different hospital without first stabilizing his emergency condition.

Defendants HIMA Insurance and the Hospital move for summary judgment, arguing that the evidentiary record creates no genuine issues of material fact as to Plaintiffs' EMTALA claims. For the reasons stated herein, Defendants' motion for summary judgment (**No. 34**) is hereby **GRANTED**.

CIVIL NO. 08-1924 (JP)          -2-

## I.   MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following facts are deemed uncontested by the Court because they were agreed upon at the Initial Scheduling Conference (No. 29), or because they were included in the motion for summary judgment or opposition and were either agreed upon or properly supported by evidence and not genuinely opposed.

Ramos, age 29 at the time, arrived at the Defendant Hospital in Fajardo, Puerto Rico on August 23, 2006 at approximately 1:00 p.m. (ISC UF 6.)  Ramos had an extensive history of abdominal conditions and anemia, and reported suffering from abdominal pain and fever. (ISC UF 5-6.)  An emergency room physician evaluated Ramos at approximately 1:20 p.m. and ordered a number of tests including CBC, basic metabolic panel, urinalysis, chest x-rays, abdominal x-rays, and a CT-scan.  (ISC UF 7.)  In addition to the examinations performed, Ramos received treatment and medication including hydration, Demerol, Vistaryl, Bentyl and Tylenol.  (ISC UF 8.)

Following the administration of said treatments, an order of discharge was entered.  (ISC UF 9.)  However, while waiting to be discharged, Ramos vomited blood.[1]  (ISC UF 10.)  The patient's condition was then reassessed and the order of discharge was cancelled.  (ISC UF 11.)  New laboratories and tests were ordered, including CBC, basic metabolic panel, TPTT, and a blood type

---

1.    The parties dispute the time and number of occasions on which Ramos vomited.
      (Pl.'s SF 15; Def.'s Reply to Pl.'s SF.)

CIVIL NO. 08-1924 (JP)          -3-

assessment. (ISC UF 11.)  Ramos was provided Tygan, Pepcid, Vitamin K, Sandostatin drip, nasogastric tube, and hydration with Ringer lactate and Bentyl. (ISC UF 11.)

Dr. Eduardo Ramon ("Dr. Ramon") diagnosed the patient as suffering from "UGIB, upper gastrointestinal bleeding." (Def.'s Ex. 1; Pl.'s Ex. 4 at 65:20.)  At the time of Ramos' treatment, the Defendant Hospital did not have gastroenterologic services available. (ISC UF 12.)  Dr. Ramon decided that the patient should be transferred to the San Juan Medical Center (Pl.'s SF 19), which does offer gastroenterologic services.  Dr. Ramon coordinated the transfer with a doctor from the San Juan Medical Center, who accepted the transfer. (Def.'s SF 14.)

Dr. Ramon prepared a document entitled "Clinical Summary and Examination at the Moment of Transfer." (Def's Ex. 1.)  Said document contains a section that states "EXPLAIN why the benefits of the transfer for the patient . . . are greater than the risks, if any for the transfer." (Def.'s Ex. 1.)  In the blank space in said section of the transfer document, Dr. Ramon wrote "Gastroenterologist." (Def.'s Ex. 1.)[2]  Dr. Ramon signed the transfer document. (Def.'s Ex. 1.)  The transfer document also

---

2.   The translated version of the transfer document states that the word in the blank space is illegible.  However, the original version contains a handwritten word that begins with the letter "G" and has a length and form consistent with "Gastroenterologist" or "Gastroenterology."  The parties agreed at the ISC that "the record states that the reason for Ramos' transfer was a lack of available gastroenterologic services." (ISC UF 13.)  Plaintiffs confirm that "[w]here it states explain, the only word is Gastroenterologist." (Pl.'s Op. to Def.'s SF 2.)

CIVIL NO. 08-1924 (JP)          -4-

contains signatures above the blank lines that state "Nurse in Charge of the Transfer" and "Signature of the Patient or Person in Charge." (Def.'s Ex. 1.)  The date and time written on the transfer document are 4:25 a.m. on August 24, 2006.  (Def.'s Ex. 1.)

An ambulance took Ramos from the Hospital at approximately 5:00 a.m. on August 24, 2006.  (Pl.'s SF 19.)  The ambulance that transported Ramos was staffed with medical technicians.  (ISC UF 14.) The records related to the patient's condition, including a summary of conditions, laboratory tests, X-rays and the CT Scan were sent to the receiving hospital with the medical technicians.  (ISC UF 15.)

Upon arriving at the San Juan Medical Center, Ramos was examined at 7:10 a.m. and described as oriented in time, place, and space, with no pain.  (ISC UF 18.)  At approximately 9:00 a.m., Ramos was administered treatment and medication at the San Juan Medical Center including intravenous fluids with normal saline at 150 ml per hour, Ringer lactate, Protonix, Vitamin K, Sandostatin, and Tigan.  (Def.'s SF 22.)  Laboratory reports performed at approximately 8:41 a.m. indicated that the patient's hemoglobin level at the time was 7.4 (Def.'s SF 21), and at 10:50 a.m. a blood transfusion was performed (Def.'s SF 23).  At 4:30 p.m., Ramos' hemoglobin level was measured at 4.0.  (Def.'s SF 24.)

At approximately 5:00 p.m., a gastroenterologic team performed an endoscopic procedure which caused Ramos' bleeding to stop. (Def.'s SF 26.)  The "Upper Endoscopy Report" prepared by a physician

CIVIL NO. 08-1924 (JP)            -5-

in the gastroenterology section reported that "at anterosuperior wall of distal bulb there was an actively bleeding ulcer . . . no signs of active bleeding post therapy."  (Def.'s Ex. 10.)

Subsequently, Ramos' bleeding started again.  Although Ramos was given blood transfusions and was taken to the operating room for an additional surgical procedure on August 25, 2006, he did not survive.  (Def.'s Ex. 12.)  Ramos was declared deceased at 6:30 p.m. on August 25, 2006.  (Def.'s ex. 12.)

## II.   **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if there is a genuine need for trial.  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25

CIVIL NO. 08-1924 (JP)          -6-

(1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Goldman, 985 F.2d at 1116.

## III. **ANALYSIS**

Defendants HIMA Insurance and the Hospital move for summary judgment, arguing that the record shows, beyond any genuine material

CIVIL NO. 08-1924 (JP)          -7-

dispute, that Plaintiffs have not provided evidence sufficient to support their EMTALA claims.  Specifically, Defendants argue that: (1) decedent Ramos was in stable condition when he was transferred from the Hospital in Fajardo to the San Juan Medical Center; (2) even assuming the patient was not stable at the time, the transfer was nevertheless in compliance with EMTALA because it was an "appropriate transfer" as defined by the statute; and (3) any alleged violation of EMTALA was not causally related to Ramos' death, which occurred at the San Juan Medical Center more than 36 hours after the transfer. The Court will now consider Defendants' arguments in turn.

### A.   **Plaintiffs' EMTALA Claims**

Plaintiffs allege that the Defendant Hospital violated EMTALA by failing to stabilize decedent Ramos' emergency medical condition, and improperly transferring him to another hospital.  EMTALA is an "anti-dumping" statute which was enacted by Congress in response to concern about the increasing number of reports that emergency rooms were refusing to accept or treat uninsured patients with emergency medical conditions.  Correa v. Hospital San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (internal citation omitted).

The statute imposes two categories of obligations upon hospitals.  First, it requires that hospitals provide an appropriate medical screening to all individuals who come to the hospital's emergency room seeking assistance.  42 U.S.C. § 1395dd(a); Correa, 69 F.3d at 1190.  Second, EMTALA requires that if an emergency

CIVIL NO. 08-1924 (JP)          -8-

medical condition exists, the hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.   See 42 U.S.C. § 1395dd(b); Correa, 69 F.3d at 1190.

In the instant case, Plaintiffs' allegations relate only to the second category of obligations regarding stabilization and transfer. The relevant language of the statute provides:

> (b) Necessary stabilizing treatment for emergency medical conditions . . .
>
> > (1) In general
> >
> > If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
> >
> > > (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> > >
> > > (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.
>
> (c) Restricting transfers until individual stabilized
>
> > (1) Rule
> >
> > If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless--
> >
> > > (A) (i) the individual (or a legally responsible person acting on the

CIVIL NO. 08-1924 (JP)          -9-

> individual's behalf) after being informed
> of the hospital's obligations under this
> section and of the risk of transfer, in
> writing requests transfer to another
> medical facility,
>
> (ii) a physician . . . has signed a
> certification that based upon the
> information available at the time of
> transfer, the medical benefits reasonably
> expected from the provision of appropriate
> medical treatment at another medical
> facility outweigh the increased risks to
> the individual . . . or
>
> (iii) if a physician is not physically
> present in the emergency department at the
> time an individual is transferred, a
> qualified medical person . . . has made the
> determination . . . and subsequently
> countersigns the certification; and

(B) the transfer is an appropriate transfer
(within the meaning of paragraph (2)) to that
facility.

A certification described in clause (ii) or
(iii) of subparagraph (A) shall include a
summary of the risks and benefits upon which the
certification is based.

(2) Appropriate transfer

An appropriate transfer to a medical facility is a
transfer--

(A) in which the transferring hospital provides
the medical treatment within its capacity which
minimizes the risks to the individual's health
. . .;

(B) in which the receiving facility--

> (i) has available space and qualified
> personnel for the treatment of the
> individual, and

CIVIL NO. 08-1924  (JP)          -10-

                (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

                (C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C) of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

                (D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

                (E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

42 U.S.C. § 1395dd(b)-(c). The Court will now proceed to apply the statute to the undisputed facts of the instant case in order to determine whether any genuine material factual disputes exist. The Court will organize its analysis in the following order: (1) existence of an emergency medical condition; (2) stabilization; and (3) appropriate transfer.

CIVIL NO. 08-1924 (JP)          -11-

### 1.   Emergency Medical Condition

The requirements to stabilize or carry out an appropriate transfer come into effect when a hospital determines that a patient has an emergency medical condition. 42 U.S.C. § 1395dd(b)(1). EMTALA defines "emergency medical condition" as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>
> (i) placing the health of the individual . . . in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part; . . . .

42 U.S.C. § 1395dd(e)(1)(a).

In the instant case, Ramos came to the Hospital complaining of abdominal pain and fever. On at least one occasion during his time at the hospital, Ramos vomited blood. Ramos was diagnosed by Dr. Ramon as suffering from UGIB, upper gastrointestinal bleeding. Although Defendants contest the issue of whether Ramos was stabilized at the time of transfer, Defendants do not argue that Ramos never exhibited an emergency medical condition during his time at the Hospital. In accordance with the uncontested evidence, and the lack of developed argumentation on this issue, the Court determines that the record is adequate to support a finding that Ramos did suffer from an emergency medical condition as defined by EMTALA.

CIVIL NO. 08-1924  (JP)          -12-

### 2.   Stabilization

Upon determining that Ramos suffered from an emergency medical condition, the Hospital was required under EMTALA to either provide treatment to stabilize the condition, or arrange a transfer that complied with subsection (c) of the statute.  42 U.S.C. § 1395dd(b). EMTALA defines "stabilize" as follows:

> to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . .

42 U.S.C. § 1395dd(e)(3).

Defendants argue that Ramos' condition was stabilized prior to the transfer.  Defendants note that the transfer document prepared by Dr. Ramon included a section titled "Patient's Condition" in which Dr. Ramon checked a box that stated "stable."  (Def.'s Ex. 1.) Defendants' expert witness, emergency medicine physician Migdalia Nieves Caban ("Nieves"), asserts that the treatment ordered by Dr. Ramon and administered by hospital personnel kept the patient stable.  (Def.'s Ex. 2 at 14.)  In particular, Nieves states that the administration of fluids, as well as Sandostatin to control bleeding, maintained Ramos in stable condition.  Id.

By contrast, Plaintiffs argue that Ramos' condition had not been stabilized when he was transferred.  Plaintiffs' expert witness, emergency medicine physician Maridolores De Leon Travesier ("De Leon"), contends that the treatment administered to Ramos was

CIVIL NO. 08-1924 (JP)          -13-

inadequate to maintain stability.  (Pl.'s Ex. 2 at 8.)  De Leon
asserts that the provision of fluids should have been more
aggressive, and that a blood transfusion should have been ordered.
Id.  De Leon contends that because of the Hospital's failure to take
these additional steps, Ramos' condition remained unstable at the
time of his transfer.

     With regard to the necessity of a blood transfusion in order to
maintain Ramos' stability, Plaintiffs' expert states that treatment
should be administered in order to maintain a hemoglobin level of
8-10.  (Pl.'s Ex. 2 at 4.)  The record reflects that Ramos'
hemoglobin level was 8.2 at 4:15 a.m. (ISC UF 17.)  Plaintiffs argue
that the medical records are inaccurate, and that in fact the reading
of 8.2 was taken around 3:00 a.m.  In either case, it is uncontested
that within approximately two hours prior to the transfer, Ramos'
hemoglobin level was over 8.  Upon arrival at the receiving hospital
in San Juan, the first laboratory reports taken indicate a hemoglobin
level of 7.4.  (ISC UF 19.)

     Viewing the evidence in the record in the light most favorable
to Plaintiffs, the Court finds that Plaintiffs have raised at least
a genuine dispute as to whether or not the Hospital had stabilized
Ramos prior to the transfer.  Applying the EMTALA definition of
stabilize, the record is sufficient to support a finding that the
Hospital did not assure, within reasonable medical probability, that
no material deterioration of Ramos' condition was likely to occur

CIVIL NO. 08-1924 (JP)          -14-

during the transfer.  In fact, his decrease in hemoglobin levels from 8.2 to 7.4 appears to indicate that his condition did continue to deteriorate during the course of the transfer to the San Juan Medical Center.  Therefore, summary judgment for Defendants on the basis of a finding that Ramos was stabilized is not appropriate.  Accordingly, the Court will proceed to consider whether the Hospital nevertheless satisfied its obligations under EMTALA by arranging a transfer that complied with subsection (c) of the statute.

### 3.  Appropriate Transfer

As stated above, EMTALA requires that when a patient presents an emergency medical condition, a hospital must either stabilize the condition or provide for transfer of the individual to another medical facility in accordance with subsection (c) of the statute. 42 U.S.C. § 1395dd(b)(1)(B); <u>Sanchez Rivera v. Doctors Center Hosp., Inc.</u>, 247 F. Supp. 2d 90, 104-05 (D.P.R. 2003) (Pieras, J.).

Subsection (c) provides that a patient who has not been stabilized may still be transferred if a physician has signed a certification that, based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at a different hospital outweigh the increased risks to the patient associated with the transfer.  42 U.S.C. § 1395dd(c)(1)(A)(ii).

However, in such cases the transfer of the patient who has not been stabilized will only comply with EMTALA if the transfer is an

CIVIL NO. 08-1924 (JP)          -15-

"appropriate transfer." An appropriate transfer for purposes of EMTALA is a transfer in which the following requirements are met: (1) the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the patient; (2) the receiving hospital has agreed to accept the patient and has adequate space and personnel to treat the patient; (3) the transferring hospital sends all relevant medical records to the receiving hospital; and (4) the transfer is effected using appropriate transportation equipment with qualified medical personnel. 42 U.S.C. § 1395dd(c)(2).

        *i.  Certification that Benefits Outweigh Risks*

     In the instant case, it is uncontested that Dr. Ramon prepared and signed a form which stated "EXPLAIN why the benefits of the transfer for the patient . . . are greater than the risks, if any for the transfer." (Def.'s Ex. 1.) In the corresponding blank space, Dr. Ramon wrote "Gastroenterologist." It is also uncontested that the Defendant Hospital did not have gastroenterologic services available, while the receiving hospital in San Juan did have a gastroenterology section. On the basis of this evidence, the Court finds that it is clear beyond genuine dispute that Dr. Ramon signed a certification that, based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at a different hospital outweighed the increased risks to the patient associated with the transfer.

CIVIL NO. 08-1924 (JP)        -16-

Plaintiffs attempt to contest the adequacy of Dr. Ramon's certification by arguing that it was insufficient because the handwritten portion that he added contained only one word, "Gastroenterologist." This argument is unconvincing. The statute does not require any minimum length of the doctor's description of the reasons why the benefits of the transfer outweigh the risks. On the contrary, a short and concise explanation is to be expected under emergency circumstances in which physicians are focusing first and foremost on treating the patient. A form that contains the question prompt already typed out and a blank for the physician to fill in promotes efficiency and strikes an appropriate balance between ensuring compliance with EMTALA while avoiding requiring the doctor devote more time than necessary to drafting paperwork instead of assisting the patient. Moreover, in this particular case the word "Gastroenterologist" was entirely sufficient to convey the relevant point – the patient needed a gastroenterologist, the Hospital in Fajardo did not have one, and the San Juan Medical Center did.

### ii. Provision of Treatment to Minimize Risks

With regard to the requirement that a transferring hospital provide the treatment within their capacity in order to minimize the risks to the patient, the Defendant hospital provided treatment and medication to Ramos including hydration, Demerol, Vistaryl, Bentyl and Tylenol. After the patient vomited, he was provided Tygan, Pepcid, Vitamin K, Sandostatin drip, nasogastric tube, and hydration

CIVIL NO. 08-1924  (JP)          -17-

with Ringer lactate and Bentyl.  Although these facts are undisputed, the parties are in disagreement as to whether or not the treatment was adequate to minimize the risks to Ramos.  Plaintiffs' expert argues that the provision of fluids should have been more aggressive, and that a blood transfusion should have been ordered.  (Pl.'s Ex. 2 at 8.)  By contrast, Defendants' expert concludes that the steps taken, including administration of Sandostin to stop bleeding, constituted appropriate treatment, within the capabilities of the Hospital, to minimize the risks.  (Def.'s Ex. 2 at 14.)

The First Circuit has not directly addressed the issue of what constitutes adequate risk minimizing treatment within the capacity of a hospital for purposes of 42 U.S.C. § 1395dd(c)(2)(A).  One court that has discussed this issue, the Tenth Circuit Court of Appeals, has held that the adequacy of treatment to minimize risks should be defined in terms of the hospital's standard procedures.  Ingram v. Muskogee Regional Medical Center, 235 F.3d 550, 552 (10th Cir. 2000). This approach is consistent with the prevailing interpretation of similar language in the screening provision of EMTALA, which is an interpretation that has been adopted by the First Circuit.  Id.; Correa 69 F.3d at 1192 (finding that an "appropriate medical screening examination within the capability of the hospital's emergency department," for purposes of 42 U.S.C. § 1395dd(a), occurs when the hospital follows its standard procedure and provides that level of screening uniformly to all patients who present

CIVIL NO. 08-1924 (JP)          -18-

substantially similar complaints).  This narrow interpretation of ambiguous terms in the EMTALA statute "ties the statute to its limited purpose, which was to eliminate patient-dumping and not to federalize medical malpractice." Ingram, 235 F.3d at 550. Accordingly, the Court will apply the rule that a Hospital meets its obligation of providing treatment within its capacity to minimize risks from a transfer when the Hospital follows its standard procedures for treating similarly situated patients.

     In the instant case, Plaintiffs have not provided evidence that the Defendant Hospital's standard procedure for a patient in Ramos' situation was to provide more aggressive fluid resuscitation or an immediate blood transfusion.  Nor is it apparent from the record that such steps are considered standard at most hospitals.  On the contrary, the use of aggressive fluid resuscitation prior to operating is controversial and has been found by several medical studies to increase risks to the patient. (Def.'s Ex. 2 at 9.)  In the absence of evidence that the Hospital failed to follow its standard procedures for minimizing risks to a patient under Ramos' circumstances, the Court finds that Plaintiffs have failed to raise a genuine factual issue regarding the Hospital's compliance with 42 U.S.C. § 1395dd(c)(2)(A).  See Ingram, 235 F.3d at 552 (rejecting plaintiffs' argument that because defendant hospital did not take additional step of inserting chest tubes in patient, hospital did not provide appropriate risk minimizing treatment; where benefits of

CIVIL NO. 08-1924 (JP)          -19-

insertion of chest tubes was medically controversial, and plaintiffs failed to provide evidence that the treatment provided breached the hospital's standard protocol, court found that summary judgment was appropriate).

### iii. Coordination with Receiving Hospital

The remaining requirements for an appropriate transfer under EMTALA are more straightforward.  It is uncontested that Dr. Ramon contacted a doctor from the San Juan Medical Center, who accepted the transfer of patient Ramos.  The San Juan Medical Center had available space and a gastroenterologic unit qualified to treat Ramos.  Thus, it is beyond factual dispute that the Hospital satisfied 42 U.S.C. § 1395dd(c)(2)(B).

### iv.  Transfer of Medical Records

It is uncontested that Dr. Ramon sent Ramos' medical records to the receiving hospital with the ambulance personnel.  These records included a summary of conditions, laboratory tests, x-rays and the CT Scan.   Therefore,  the  Hospital  complied  with  42  U.S.C. § 1395dd(c)(2)(C).

### v.  Transportation Equipment and Personnel

It is also uncontested that the transfer of Ramos from the Defendant Hospital in Fajardo to the receiving hospital in San Juan was effected using an ambulance staffed with qualified medical technicians.    Thus,   the   Hospital   satisfied   42   U.S.C. § 1395dd(c)(2)(D).  There being no genuine factual dispute as to any

CIVIL NO. 08-1924 (JP)          -20-

of the statutory requirements, the Court finds that the Hospital arranged an appropriate transfer as defined by EMTALA, 42 U.S.C. § 1395dd(c)(2). In light of this finding, the Court need not proceed to consider Defendants' additional argument regarding causation.

## IV.  <u>CONCLUSION</u>

In conclusion, the Court finds that Plaintiffs have presented evidence showing, or at least raising a factual dispute regarding, the existence of an emergency medical condition and the lack of stabilization of the condition prior to transfer. However, Plaintiffs have not presented evidence to raise a genuine factual issue as to the Hospital's compliance with EMTALA's rules regarding an appropriate transfer. The record shows beyond dispute that Dr. Ramon certified that the benefits of treatment by a specialized gastroenterologic unit outweighed the risks associated with the transfer, that the Hospital provided treatment within its capacity to minimize the risks, that the transfer was coordinated with the receiving hospital in San Juan, and that the transfer was effected using appropriate transportation equipment staffed by qualified medical technicians.

In light of this evidence, Defendants are entitled to summary judgment because the record does not present a trial-worthy issue that could support a finding of an EMTALA violation. Accordingly, Defendants HIMA Insurance and the Hospital's motion for summary

CIVIL NO. 08-1924  (JP)          -21-

judgment is **GRANTED**.  The Court will enter judgment dismissing the

complaint with prejudice.

     **IT IS SO ORDERED.**

     In San Juan, Puerto Rico, this 23rd day of December, 2009.


                            S/ Jaime Pieras, Jr.
                               JAIME PIERAS, JR.
                        U.S. SENIOR DISTRICT JUDGE